**STUHLBARG INTERNATIONAL SALES COMPANY, INC., a California corporation, d/b/a Sisco, Plaintiff–Appellee,**

v.

**JOHN D. BRUSH AND COMPANY, INC., a New York corporation, Defendant–Appellant.**

Nos. 99–56676, 99–56875.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 16, 2000.

Filed Feb. 13, 2001.

Gary M. Anderson (argued), Vern Schooley, Russell C. Pangborn, Fulwider, Patton, Lee & Utecht, LLP, Long Beach, for appellee Stuhlbarg International Sales Co., Inc.

Before: HUG,* McKEOWN, and PAEZ, Circuit Judges.

McKEOWN, Circuit Judge:

This case, which arises from a trademark dispute over the use of the term "Fire–Safe," was precipitated by the U.S. Customs Service's detention of imported safes bearing that mark. Stuhlbarg International Sales Co., known as Sisco, brought a suit for declaratory judgment and cancellation of the "Fire–Safe" trademark owned by John D. Brush & Co. The district court granted Sisco's request for a preliminary injunction. It restrained Brush from interfering with Sisco's importation of safes, and ordered Brush to consent to the Customs Service's release of the detained products. On appeal, Brush challenges the district court's jurisdiction, arguing that exclusive jurisdiction rests with the Court of International Trade and that the claims are barred by the doctrines of exhaustion and ripeness. Brush also contests the preliminary injunction. We conclude that the district court had jurisdiction, was not barred from hearing the claim, and did not abuse its discretion in issuing the preliminary injunction.

## BACKGROUND

Brush and Sisco are competitors in the home and small business strongbox market. Each company produces safes designed to protect the contents from fire. Since about 1930, Brush has manufactured

William Roberts (argued), Richard P. McElroy, Timothy D. Pecsenye, Rachel L. Brendzel, Blank, Rome, Comisky & McCauley, LLP, Philadelphia; Dennis G. Martin, Willmore F. Holbrow III, Blakely, Sokoloff, Taylor & Zafman, LLP, Los Angeles, for appellant John D. Brush & Co., Inc.

* Judge Hug was drawn to replace Judge Canby. He has read the briefs, reviewed the record and listened to the tape of oral argument held on November 16, 2000.

and sold fire-resistant security storage boxes. Brush claims to have used the mark "Fire–Safe" for more than 30 years, although its trademark application indicates only that the mark was used at least as early as 1984. Brush is the owner of two federally registered trademarks:

1. U.S. Trademark Registration No. 1,395,406, granted in 1986, for "all purpose non-metallic lockable containers for storing valuables;" and

2. U.S. Trademark Registration No. 1,572,870, granted in 1989, for "fire resistant containers in the nature of safes, security chests, and filing cabinets."

Sisco is of somewhat more recent vintage. Morton Stuhlbarg, Sisco's founder and president, is a former Brush employee. After leaving Brush in the late 1970s, he formed the now-defunct Saga International, Inc., and thereafter started Sisco.[1] Sisco manufactures safes which have recently been sold under the Brinks Home Security label as "The Protector Firesafe."

For more than ten years, the parties have, in one form or another, been engaged in a trademark dispute over the term "Fire–Safe." Since at least 1987, Sisco has used the term "firesafe" with Brush's knowledge.[2] Over the years, Brush has engaged in a series of escalating responses. First, judging that Sisco's sales were insignificant, Brush made a calculated judgment to rely on the marketplace. Next, in 1990 Brush objected in writing to Sisco's use of the term "firesafe." Sisco responded by denying infringement, stating that the mark was de-

scriptive and generic, and making clear that it would continue to use it. Brush did not sue Sisco or take further action at that time.

When the market picked up in the late 1990s, Brush decided to take more definite action. In 1997, it unsuccessfully attempted to enforce a court-approved stipulation between Brush and Saga against Sisco. See supra note 1. The relationship soured still further in 1999 when, according to Brush, Sisco began targeting Brush's major customers. From May through October 1999, Sisco secured significant orders for its products from large retailers who had been buying from Brush, including Staples, Target, and Kmart. This signaled a substantial increase in potential sales and market share, and prompted Brush to take the action that precipitated this lawsuit: in June 1999, Brush recorded its "Fire–Safe" trademark with the U.S. Customs Service. Thus, on October 8, 1999, Customs detained nine containers holding approximately 6,400 Sisco safes. The safes were destined for one of Sisco's new customers, Kmart, and were due at Kmart distribution centers in late October. Customs did not provide Sisco with notice of seizure or exclusion. Sisco did not file a protest with Customs or a complaint in the Court of International Trade.

Instead, five days after detention, Sisco filed suit in federal district court, seeking a declaratory judgment of non-infringement and cancellation of Brush's trademarks. Upon Sisco's motion, the court issued a temporary restraining order;[3] a contempt

1. In 1986 Brush and Saga were involved in a patent and trademark dispute that resulted in a Stipulation and Order for Permanent Injunction enjoining Saga from misappropriation of Brush's intellectual property. In an earlier action, the district court determined that Sisco was not bound in any way by the Stipulation. See Saga Int'l, Inc. v. John D. Brush & Co., 984 F.Supp. 1283, 44 U.S.P.Q.2d 1947 (C.D.Cal.1997).

2. Brush's registered trademarks use the hyphenated term "Fire–Safe," whereas Sisco's products use the single word "firesafe." This

difference explains our use of the two terms throughout this Opinion.

3. The TRO as originally issued ordered the Customs Service to release the goods. After the United States protested, arguing that it was not a party to the case, that it was an indispensable party, and that it had sovereign immunity, the district court removed all reference to Customs, but left in place a requirement that Brush consent to the release of the goods.

order; and a preliminary injunction in which it enjoined Brush from hindering Sisco's importation of safes bearing the designations "Firesafe," "Fire–Safe," or "Fire Resistant Safe" and ordered Brush to provide Customs with written consent to Sisco's importation of safe products. Brush appeals these orders.

## DISCUSSION

### I. SUBJECT MATTER JURISDICTION

■ Brush contends that the district court did not have subject matter jurisdiction over this case, and that the Court of International Trade has exclusive jurisdiction to hear a challenge to the detention of Sisco's goods. The existence of subject matter jurisdiction is a question of law reviewed de novo. *See Garvey v. Roberts,* 203 F.3d 580, 587 (9th Cir.2000).

This case lies at the intersection of two legal/factual contexts: trademark protection and customs regulation. For although this case involves goods detained by Customs, at bottom it is a suit seeking cancellation of federally registered trademarks and a declaration of non-infringement. Sisco's beef is with Brush's assertion of its claimed trademark rights. The complication arises here because those two subjects-trademark and customs-are governed by different jurisdictional provisions.

In general, federal district courts have original jurisdiction over actions based on federal statutes relating to trademarks. 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1338; *see K mart Corp. v. Cartier, Inc.,* 485 U.S. 176, 182, 108 S.Ct. 950, 99 L.Ed.2d 151 (1988) ("Both the general federal-question provision ... and the specific provision regarding actions ... relating to trade-marks ... would, standing alone, vest the district courts with jurisdiction over this action."). This grant of jurisdiction is limited, however, by statutes conferring exclusive jurisdiction on the Court of International Trade, or CIT. *Id.* The CIT's exclusive jurisdiction is well defined in four sections of the federal code, 28 U.S.C. §§ 1581–1584, that deal primarily with civil customs and trade actions by and against the United States. Unless an action falls within the CIT's exclusive "carve out" jurisdiction, then jurisdiction is proper in the district court.

This dichotomy between district court and CIT jurisdiction creates a much-litigated distinction between parties who challenge a *seizure* of goods (who may sue in district court) and parties who challenge a denial of a protest of *exclusion* of goods (who may challenge the denial only in the CIT). The difference was summarized by the CIT in *R.J.F. Fabrics, Inc. v. United States,* 651 F.Supp. 1431, 1433 (1986): "The practical effect of ... [exclusion] is to deny entry into the customs territory of the United States. The importer may then dispose of the goods as he chooses. In the case of seizure, however, the government often takes control of the merchandise, and may ultimately institute forfeiture proceedings."

Here, Brush argues that jurisdiction is properly in the CIT under 28 U.S.C. § 1581(a), which governs civil actions against the United States "to contest denial of a protest" under "the Tariff Act of 1930." This argument fails—Sisco has not sued the United States to appeal denial of a protest, but rather has sued Brush to challenge the Fire–Safe trademark.

Although Sisco was notified that its goods were detained, Customs did not provide notice indicating that the goods were seized or excluded. Sisco's goods were in limbo. Indeed, it appears that Sisco's goods were not, as excluded goods are, available for disposal outside the United States, were not free to be diverted elsewhere, and could not be "dispose[d] of ... as [Sisco] chooses." *R.J.F.,* 651 F.Supp. at 1433. In this case, it is not at all clear that the goods were either seized or excluded. But the record does indicate that there was never a notice of exclusion, or a protest of exclusion, or a denial of a protest. Thus, just as in *K mart Corp. v. Cartier, Inc.,* "this suit involves no 'protest,' much

less a denial of one," 485 U.S. at 190–91, 108 S.Ct. 950.

On the other hand, characterizing this as a trademark action-or alternately, as a seizure action, and not a denial of an exclusion protest-is consistent with the district court's jurisdiction over substantive trademark disputes. The CIT jurisdiction statutes do not divest a federal district court of jurisdiction over the underlying trademark dispute.[4] Sisco's complaint does not charge the Customs Service with improper application of its regulations; rather, it is a declaratory judgment suit under the Lanham Act that concerns substantive trademark issues. The district court's original trademark jurisdiction is not destroyed simply because Sisco sought the release of detained goods as a partial remedy. As the district court noted, "the exclusion-seizure distinction is not dispositive where the underlying dispute involves substantive trademark issues."

The CIT itself has consistently held that substantive trademark disputes are properly brought in district court, even where there *is* denial of a protest of a notice of exclusion. In *Tempco Marketing v. United States,* 957 F.Supp. 1276 (1997), the importer received a notice of exclusion, which it protested. Ordinarily, this would result in exclusive jurisdiction in the CIT. But the CIT itself held that jurisdiction was proper in the district court because the underlying issue was one of trademark law, and the goods were eventually seized. *Id.* at 1279. Similarly, in *International Maven v. McCauley,* 678 F.Supp. 300 (1988), the CIT determined that it had jurisdiction over a challenge to Customs regulations, but the district court properly had jurisdiction over the substantive trademark issue. *Id.* at 304. Where the underlying issue is not trademark law, but Customs regulations, the converse is true: In *Milin Industries, Inc. v. United States,* infringing goods were first excluded and

then seized. The eventual seizure did not, however, destroy exclusive jurisdiction in the CIT because the underlying issue was "the proper classification of imported merchandise." 691 F.Supp. 1454, 1457 (1988).

We conclude that the district court had jurisdiction over Sisco's trademark suit.

## II. EXHAUSTION AND RIPENESS

Brush lodges two additional threshold challenges to Sisco's action-exhaustion and ripeness. These arguments are premised on Brush's view that the case should be viewed as a Customs case rather than a trademark case.

▪ Generally speaking, the exhaustion doctrine "provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Rationales for the doctrine include (1) avoiding premature interruption of the administrative process; (2) letting the agency develop the necessary factual background for decisions; (3) giving the agency the first chance to exercise its discretion and apply its expertise; and (4) avoiding judicial interference with an agency until it has completed its action. *Id.* at 193–94, 89 S.Ct. 1657.

▪ Here, Brush contends that Sisco should have gone through the Customs Service's detention and administrative process before it brought suit. That process may be described as follows. If Customs discovers goods bearing a *counterfeit* mark, it seizes the goods for forfeiture. 19 C.F.R. §§ 133.21, 133.22. However, if Customs discovers goods bearing an *infringing* mark,

> [s]uch infringing articles are detained by the Customs Service for thirty days, during which time Customs is authorized to provide information to the owner of

---

4. In addition, even if the goods were excluded, the CIT only has jurisdiction over a challenge to a denial of a protest of exclusion.

Here, there was no denial of a protest to challenge.

the allegedly infringed intellectual property to help determine infringement. During the thirty-day detention period, the importer may secure their release by showing that: the foreign and U.S. marks are owned by the same business or are in a parent-subsidiary relationship or are under common ownership or control; or that the mark was applied under authorization of the U.S. owner; or that the mark will be removed or obliterated; or that the U.S. recordant gives written consent.

4 MCCARTHY ON TRADEMARKS § 29.42 at 29–81 (1999). If the allegedly infringing party receives notice of exclusion, it then has the following administrative remedies: (1) obliteration of the trademark pursuant to 19 C.F.R. § 133.22(c)(1); (2) initiation of a judicial forfeiture proceeding pursuant to 19 U.S.C. § 1608; (3) petition for discretionary remission or mitigation pursuant to 19 C.F.R. § 171.11 and 19 U.S.C. § 1618; and appeal to the Court of International Trade pursuant to 28 U.S.C. § 1581.

Under this administrative regime, it would have been futile for Sisco to attempt to exhaust its administrative remedies, for two reasons: (1) the validity of a trademark cannot be challenged in a forfeiture proceeding because the CIT does not have jurisdiction over substantive trademark issues; and (2) the administrative process would have left Sisco without any remedy during the detention period.

First, the administrative forum is not the appropriate venue for the trademark challenge. Most significantly, the validity of a trademark cannot be challenged in a forfeiture proceeding. *See* 4 MCCARTHY ON TRADEMARKS § 29:44 at 29–84 (1999). Further, if Sisco chose to petition for discretionary remission or mitigation of forfeiture pursuant to 19 U.S.C. § 1618, it would "bind[ ] the plaintiff exclusively to the available administrative remedies," and foreclose judicial review. *Noel v. United States,* 16 Cl.Ct. 166, 171 (1989). In addition, as noted above, the CIT has no jurisdiction over substantive trademark issues.

Regardless which administrative path Sisco might take, its trademark dispute would be unresolved and its goods prevented from entering commerce with the term "firesafe." Therefore, none of these options would serve the goals of maturity, creation of a more complete factual record, application of agency expertise, or ripeness under *McKart.*

Second, the administrative process left Sisco without any remedy during the detention period. And while Brush argues that Sisco could have petitioned Customs for relief from exclusion, seizure, or forfeiture, it is not clear what petition process was available to Sisco. As noted above, Sisco was never given an official notice of exclusion. Only after a notice has been issued can an importer petition for relief under 19 C.F.R. § 171.0, or claim the seized items by giving a bond under 19 U.S.C. § 1608.

In this case, none of the above options was available. After Sisco's safes were detained by Customs on October 8, and absent any notice of seizure, Sisco's goods presumably entered a 30–day detention period. 19 C.F.R. § 133.25. During this period, Customs regulations would have allowed the release of the detained goods only under specified circumstances, such as the removal or obliteration of the offending mark, 19 C.F.R. § 133.22(c)(1), or upon consent of the trademark owner, 19 C.F.R. § 133.22.(c)(3). If the detained goods were not released within 30 days, Customs could seize the items and initiate forfeiture proceedings. 19 C.F.R. § 133.22(f). Therefore, absent Brush's consent, Sisco could not obtain the release of its goods without undergoing the substantial delay and expense associated with an effort to relabel the 6,400 safes.

But Sisco was faced with a delivery deadline of October 28, and needed to obtain the immediate release of its goods to avoid irreparable harm stemming from lost contracts and customers, and harm to its business reputation and goodwill. *See Gibson v. Berryhill,* 411 U.S. 564, 575 n.

14, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (noting that administrative remedies are deemed inadequate "[m]ost often ... because of delay by the agency"). Thus, given the time constraints involved, relabeling was not an adequate remedy, and would cause precisely the harm Sisco sought to avoid. The available administrative remedies, then, offered no way to obtain a hearing on the trademark dispute, or even secure release of the goods without obliteration of the mark. None of the remedies would serve the goals discussed in *McKart* and thus were manifestly inadequate.[5]

■ Piggybacking on its exhaustion argument, Brush contends that in the absence of final agency action, this case is not ripe for review under *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and *Lee Pharmaceuticals v. Kreps*, 577 F.2d 610, 618 (9th Cir.1978). Ripeness is a question of law reviewed de novo. *See Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1131 (9th Cir.1998), *cert. denied* 526 U.S. 1111, 119 S.Ct. 1754 (1999). *Abbott Laboratories* and *Lee Pharmaceuticals* establish that, just as the case or controversy requirement of Article III prevents a court from hearing an abstract question, the ripeness requirement prevents "the courts ... from entangling themselves in abstract disagreements over administrative policies, and also ... protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a

concrete way by challenging parties." *Lee Pharmaceuticals*, 577 F.2d at 618.

Ripeness might be an issue if Sisco had sued the Customs Service, but it did not. Sisco does not challenge a government agency's decision; its dispute is with Brush, and its professed harm is evident. As required for any suit for declaratory judgment, there is a concrete and ripe dispute. In addition, the cases explaining the need for a "final agency action" are inapposite because Sisco does not challenge an agency action—it challenges the validity of a trademark.[6]

### III. PRELIMINARY INJUNCTION

■ Brush argues that the district court abused its discretion when it granted the preliminary injunction.[7] The grant or denial of a preliminary injunction will be reversed only when the district court abused its discretion, or based its decision on an erroneous legal standard or clearly erroneous findings of fact. *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir.2000). "[U]nless the district court's decision relied on erroneous legal premises, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir.1982).

■ This circuit's longstanding standard for a preliminary injunction is well known: The moving party must show either (1) a combination of probable success on the

---

**5.** In response to the exhaustion dilemma, Brush argues that two key cases support its position: *Luxury International, Inc. v. United States*, 69 F.Supp.2d 1364 (1999) and *Miss America Organization v. Mattel, Inc.*, 945 F.2d 536 (2d Cir.1991). *Luxury* is readily distinguished because, unlike here, it involved an exclusion order issued by the Customs Service. *Miss America* arose from a copyright dispute, not a trademark dispute. Unlike trademark, the Customs Service is specifically authorized to determine copyright infringement in administrative proceedings. *See* 19 C.F.R. § 133.431(d). No court has extended

*Miss America* to the trademark arena and we decline to do so.

**6.** Therefore, the recent case of *Nippon Miniature Bearing Corp. v. Weise*, 230 F.3d 1131 (9th Cir.2000), does not affect the analysis.

**7.** Brush also challenges the temporary restraining order that preceded the preliminary injunction. Because our analysis is substantially identical for the injunction and the TRO, we do not address the TRO separately.

merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. *Dr. Seuss Enters. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1397 n. 1 (9th Cir. 1997). These standards "are not separate tests but the outer reaches of a single continuum." *International Jensen, Inc. v. Metrosound U.S.A.,* 4 F.3d 819, 822 (9th Cir.1993) (citation omitted). Here, the district court evaluated Sisco's motion primarily under the first prong of this standard. "In an appeal from the granting of a preliminary injunction, the appellate court will view the facts most favorable to the plaintiff and all factual conflicts will be resolved in favor of the prevailing party." 5 McCarthy on Trademarks § 30:56 at 30–97 (1999).

## A. Likelihood of Success on the Merits

 Sisco does not dispute that Brush's "Fire–Safe" mark is incontestible, and is therefore immune from challenge on certain grounds. *See* 15 U.S.C. § 1115(b). An incontestible mark may be challenged, however, on the grounds that the mark is generic. *Id.; see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

 Whether a mark is generic is a question of fact. *See* 2 McCarthy on Trademarks § 12:12 (1999), (citing *Committee for Idaho's High Desert v. Yost,* 92 F.3d 814 (9th Cir.1996)). Here, the district court found that the terms "Firesafe" and "Fire Safe" are widely used by third parties in the safe industry, and that Brush was aware of Sisco's use of the terms since at least 1987. Sisco submitted evidence that thirteen competitors use the term "fire safe" to refer to a type or category of safe, Brush itself had used the term in a generic sense, and the term is included in at least one dictionary.

 To counter this evidence, Brush submitted excerpts from a consumer survey purportedly showing forty-four percent consumer awareness of the term "Fire–Safe." Surveys in trademark cases may be considered so long as they are conducted according to accepted principles. *See Prudential Ins. Co. v. Gibraltar Fin. Corp.,* 694 F.2d 1150, 1156 (9th Cir. 1982) ("Technical unreliability goes to the weight accorded a survey, not its admissibility.") In considering what weight to give a survey, the court may consider a variety of factors, including survey design, nature of the questions asked, and the experience and reputation of the surveyor. *See E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1292–93 (9th Cir.1992). Here, the district court noted that the survey excerpts do not indicate whether the consumers were asked to identify the term "firesafe" as a brand name or a common name, a critical issue in a case involving genericness. Simply asserting consumer awareness of the term begs the question. Nor did the submission address the format of the survey or its methodology. Without any information regarding the survey design, questions, or methodology, the district court did not abuse its discretion by ascribing little weight to the survey excerpts submitted by Brush. And, although Brush had the opportunity to present additional evidence (including expert testimony) about the survey, it declined to do so.

The district court considered all of the parties' submissions, applied the correct standard for determining whether a term is generic, and found "that the plaintiff has shown a likelihood that the defendant's mark is subject to cancellation as generic." This finding cannot be characterized as clear error; we therefore conclude that the district court did not abuse its discretion in finding a likelihood of success on Sisco's claim of genericness.

## B. Possibility of Irreparable Harm

 The district court concluded that allowing Brush to use the Customs Service to detain Sisco's goods would result in the possibility of irreparable harm to Sisco, especially because the detained goods were

earmarked for initial orders from large new customers. In addition, the district court determined that, for purposes of evaluating irreparable injury, the appropriate status quo was one that permitted unhindered Sisco imports of safes called "The Protector Firesafe," and Sisco's use of the term "firesafe" in connection with other products.[8] Brush responds, as it did before the district court, that the mere presence in the marketplace of Sisco products called "firesafes" causes Brush irreparable harm. If that harm does exist, however, it is not new; Sisco has used the term "firesafe" for years. The only difference is Sisco's recent success in the marketplace coupling the "Brinks Home Security" brand name with its non-trademark use of the term "firesafe."

We conclude that the district court did not abuse its discretion in its analysis of the preliminary injunction. The district court found that, without the injunction, Sisco stood to lose its newfound customers and accompanying goodwill and revenue. Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37–38 (2d Cir.1995) (in trademark licensing case, deprivation of opportunity to expand business is irreparable harm). On the record before us, that finding is not clearly erroneous. Nor did the district court misapply the legal principles governing irreparable harm. Thus, we affirm the grant of the preliminary injunction.

AFFIRMED.

---

**8.** Although the nature of the mandatory injunction-requiring Brush to provide the Customs Service with consent to importation-may be somewhat unusual, it was within the broad discretion of the district court to fashion a remedy to preserve the status quo and prevent irreparable harm. Brush acknowledged that the court had the authority to order consent, even while it disagreed with the district court's view of the status quo. The court itself determined that it could not direct its order at the Customs Service, which was not a party, and amended its first TRO appropriately.