**John GARAMENDI, etc., Plaintiff,**

v.

**ALTUS FINANCE S.A.,
et al., Defendants.**

No. CV 99–02829 AHM (CWx).

United States District Court,
C.D. California.

Feb. 29, 2012.

Arthur J. Shartsis, Shartsis Friese and Ginsburg, Cedric C. Chao, Morrison & Foerster, Gary Martin Cohen, Patricia K. Staggs, Steven J. Green, Yi–Yi Chang, Adam M. Cole, California Department of Insurance, Arthur J. Shartsis, Charles R. Rice, Shartsis Friese and Ginsburg, San Francisco, CA, Mark R. McDonald, Morrison & Foerster LLP, Sharon A. Urias, Thelen Reid & Priest, Los Angeles, CA, for Plaintiff.

James Patrick Clark, Gibson Dunn & Crutcher LLP, Los Angeles, CA, Marshall R. King, Robert L. Weigel, Gibson Dunn & Crutcher, New York, NY, for Defendants.

## ORDER RE MOTION FOR SANCTIONS

RALPH ZAREFSKY, United States Magistrate Judge.

This matter came before the Court on February 6, 2012, on the motion of Defendant Artemis S.A. for sanctions that would terminate this action. [Doc 4008] Artemis appeared through its counsel Robert L. Weigel, Jason W. Myatt and Alison L. Wollin. Plaintiff California Insurance Commissioner appeared through its counsel Arthur J. Shartsis and Charles R. Rice. Intervenor NOLHGA appeared through its counsel Franklin D. O'Loughlin and Cindy Coles Oliver. The Court heard argument of counsel and took the matter under submission. The Court has reviewed thoroughly the voluminous submissions from the parties and, being fully advised, now denies the motion.

Artemis seeks to have the action dismissed as a sanction for the Commissioner's production of documents in September and November 2011, discovery having closed years ago, and the trial having taken place in 2005. At the time of the recent production, the Commissioner delivered to Artemis approximately 40,000 documents that apparently had been housed at the law firm of Cantilo & Bennett in Austin, Texas.

Both sides (including the intervenor) have analyzed this motion under FED. R. CIV. P. 37, the rule governing sanctions for discovery violations. At the hearing on the motion, the Court asked all counsel if Rule 37 in fact provided the appropriate legal rubric, given the posture of the case. All parties stated their belief that Rule 37 provided the governing standard. The Court is not so sure.

To begin with, this case does not stand in the usual posture when Rule 37 is invoked. A very substantial trial took place in 2005, followed by an appeal. Rule 37, however, is part of the Federal Rules of Civil Procedure governing *pretrial* proceedings, when a matter has not yet been tried. This is apparent from the structure of the Federal Rules themselves, which are divided into various titles, roughly corresponding to the course of an action. The rules progress from the filing of pleadings to trial and judgment, then post-judgment, with various other matters interspersed. The organization of the Rules suggests that the discovery statutes, and remedies for violations of the discovery statutes, pertain to violations that take place prior to trial.

This structural notion is reinforced by the nature of the cases that construe Rule 37. The cases cited by the parties almost all arose in a pretrial context. None addressed a discovery violation that was raised, after a case had gone to trial, and concerned the matter that was tried. *Malone v. U.S. Postal Service,* 833 F.2d 128 (9th Cir.1987); *Thompson v. Housing Authority of City of Los Angeles,* 782 F.2d 829 (9th Cir.1986); *In re Phenylpropanolamine (PPA) Products Litigation,* 460 F.3d 1217 (9th Cir.2006); *Valley Engineers, Inc. v. Electric Engineering Co.,* 158 F.3d 1051 (9th Cir.1998); *Payne v. Exxon,* 121 F.3d 503 (9th Cir.1997); *Construction Laborers Trust Funds for Southern California Administrative Company v. Rosal,* 2008 WL 4500757 (C.D.Cal.2008); *Henry v. Gill Industries, Inc.,* 983 F.2d 943 (9th Cir.1993); *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *United States v. Sumitomo Marine & Fire Insurance Co., Ltd.,* 617 F.2d 1365 (9th Cir. 1980); *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062 (2d Cir.1979); *Robison v. Transamerica Ins. Co.,* 368 F.2d 37 (10th Cir.1966); *G–K*

*Properties v. Redevelopment Agency of the City of San Jose,* 577 F.2d 645 (9th Cir.1978); *Adriana International Corp. v. Thoeren,* 913 F.2d 1406, 1412 (9th Cir.1990); *Wyle v. R.J. Reynolds Industries, Inc.,* 709 F.2d 585 (9th Cir.1983); *United States for Use and Benefit of Wiltec Guam, Inc. v. Kahaluu Construction Co., Inc.,* 857 F.2d 600 (9th Cir.1988); *Shcherbakovskiy v. Da Capo Al Fine, Ltd.,* 490 F.3d 130 (2d Cir.2007); *Fjelstad v. American Honda Motor Co.,* 762 F.2d 1334 (9th Cir.1985); *In re Rubin,* 769 F.2d 611 (9th Cir.1985); *Patton v. Aerojet Ordnance Co.,* 765 F.2d 604 (6th Cir.1985); *Illinois Central Railroad Co. v. Templar,* 463 F.2d 972 (10th Cir.1972). By the same token, the few cases that the Court has found where discovery violations have been raised after trial never have applied Rule 37 as the governing rubric. *See Anderson v. Beatrice Foods Co.,* 900 F.2d 388 (1st Cir.1990); *Marquip, Inc. v. Fosber America, Inc.,* 30 F.Supp.2d 1142 (W.D.Wis.1998); *Dankese Engineering, Inc. v. Ionics, Inc.,* 89 F.R.D. 154 (D.Mass.1981); *see also Barnes v. City of Chicago,* No. 98 C 5590, 2000 WL 1745180 (N.D.Ill.2000), at *2 (stating that, in contrast to Rule 56, "Ordinarily, Rule 37 motions are made during the pendency of the action to facilitate discovery").

A look at the standard governing terminating sanctions under Rule 37 further reinforces the notion that Rule 37 is meant to apply prior to trial. Thus, the following is a list of factors that the Court is instructed to consider under Rule 37 when a motion for terminating sanctions is made:

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.

*Malone v. U.S. Postal Service,* 833 F.2d 128, 130 (9th Cir.1987), quoting *Thompson v. Housing Authority of City of Los Angeles,* 782 F.2d 829, 831 (9th Cir.1986). These are all factors that require the Court to consider the impact of ending a case before it goes to trial. The public does not have an interest in expeditious resolution of matters that already have been tried; by definition, they have been resolved, and the matter is off the Court's docket. Cases that have been tried *have* been disposed of on the merits, and whatever "prejudice" will occur has already taken place and will be reversed if the motion is granted and affirmed if it is not. And why would the Court consider "less drastic sanctions" than dismissal for matters that already have been tried?

It is true, of course, that a portion of the present case remains to be tried but, as defined by the Ninth Circuit, it is a quite limited portion, and the construct of Rule 37 still does not fit very well. In seeking termination of the action, Artemis seeks a sanction that would have the effect of contradicting a jury verdict on liability that has been affirmed by the Court of Appeals.[1] Artemis is quite upfront about this: *"First,* and foremost, the Commissioner's suppression of the Maisel Documents impacted the trial." (Joint Stipulation at 56:5–6) (emphasis in original); "We will never know what impact the Maisel Documents would have had on the jury verdicts—whether they would have altered the jury's finding of harm or been enough to bring the jurors together and decide against the NOLHGA Premise." (Joint Stipulation at 56:17–20.) The time for filing a motion to set aside the jury verdict, of course, long since has passed. FED.R.CIV.P. 59. Relying on Rule 37 to effectuate the setting aside of the verdict does not take into account the fact that this case was tried, and that the Court of Appeals has affirmed the liability determination. The Court cannot consider the present motion without taking

---

1. The Court is aware that, at the first trial, Verdict Form No. 7, involving the NOLHGA premise, was presented to the jury in the liability phase. However, the Court of Appeals analyzed the form as if it were part of the damages phase, *California v. Altus Finance S.A.,* 540 F.3d 992, 1006 (9th Cir.2008), and, in ordering a retrial as to the NOLHGA Premise, the Court classified the

issue as one of damages. ("We reverse the Post–Verdict Order and remand for a new damages phase trial limited to proffer of the NOLHGA Premise and a determination of damages (including punitive damages), if any, on that theory." 540 F.3d at 1009.) The issue of whether harm existed—that is, liability—was determined by the jury and affirmed by the Court of Appeals.

those facts into account, and doing so brings into play the law of the case doctrine, and the related mandate doctrine.

 "The law of the case doctrine provides that 'the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case.'" *Chevron USA, Inc. v. Bronster*, 363 F.3d 846, 849 (9th Cir.2004) (quoting *Bernhardt v. Los Angeles County*, 339 F.3d 920, 924 (9th Cir. 2003) (citation omitted)). A prior ruling need not be expressly made, or discussed in any detail, to serve as the law of the case; decisions that are implicit, or terse, will suffice. *See id.* (matters "decided by necessary implication" included); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1392–93 (9th Cir.1995). A district court's failure to follow the law of the case, as established by a ruling of its supervising court of appeals, constitutes an abuse of discretion unless one of the following "three recognized exceptions" applies:

(1) the earlier decision is clearly erroneous[,] [or] its enforcement would work a manifest injustice; (2) intervening controlling authority makes reconsideration appropriate; or (3) substantially different evidence was adduced at a subsequent trial.

*Bronster*, 363 F.3d at 849 (following *In re Rainbow Magazine, Inc.*, 77 F.3d 278, 281 (9th Cir.1996)); *see id.* n. 1 (noting, as to first listed exception, that the Ninth Circuit has sometimes required *either* "clear error" *or* "injustice," and at other times has required both elements).

 Related to the law of the case doctrine is the "mandate rule," whereby an inferior court must obey the mandate of its supervising appellate court. *See Insurance Group Comm. v. Denver & Rio Grande Western R.R. Co.*, 329 U.S. 607, 612, 67 S.Ct. 583, 91 L.Ed. 547 (1947) ("When matters are decided by an appellate court, its rulings, unless reversed by it or by a superior court, bind the lower court."). Put differently, "district courts are not free to decide issues on remand that were previously decided either expressly or by necessary implication on appeal." *Mirchandani v. United States*, 836 F.2d 1223, 1225 (9th Cir.1988) (*citing Liberty Mut. Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir.1982), *and Stevens v. F/V Bonnie*

*Doon*, 731 F.2d 1433, 1435 (9th Cir.1984)). Lower courts' adherence to the mandate rule is absolutely "necessary to the operation of a hierarchical judicial system." *Id., citing* 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE & PROCEDURE § 4478 (1981).

This is not to say, of course, that this Court completely lacks authority to dismiss the action now. Rather, it bespeaks caution in looking for the contours of such authority to a rule like Rule 37, whose office normally is to govern before a case has been tried, and certainly before a matter has been appealed. A more apt source of the limits of such authority comes from Rule 60, the Rule normally applied when a party seeks redress post-judgment. Yet Rule 60, by its terms, is not limited simply to final "judgments." Rule 60(b) allows a court to relieve a party from "a final judgment, *order or proceeding*" (emphasis added). There is not a final judgment here in the sense of an executable judgment—there are not any damages to collect, for example—but there is a final order or proceeding in the sense that the jury verdict on liability, as liability has been defined by the Ninth Circuit, is indeed final.

The most pertinent portion of Rule 60(b) to the current application would be subsection (6), for the other potentially applicable sources, such as subsection (2) (newly discovered evidence) or (3) (fraud), would not be available because it is too late to use them. *See* Rule 60(c)(1). In keeping with the limited nature of relief to be accorded when seeking to undue a final order or proceeding, Rule 60(b)(6) is used "'sparingly as an equitable remedy to prevent manifest injustice.' To receive relief under Rule 60(b)(6), a party must demonstrate 'extraordinary circumstances which prevented or rendered him unable to prosecute [his case].'" *Lal v. California*, 610 F.3d 518, 524 (9th Cir.2010) (citations omitted). This standard dovetails with the respect due the jury verdict here under the law of the case doctrine and the mandate rule. Relief takes an extraordinary showing, a showing that manifest injustice would ensue because Defendant had been prevented from appropriately defending itself. Like Rule 60(b)(6), the law-of-the-case doctrine also requires a showing of manifest injustice

or *substantially* different evidence before deviation from the appellate ruling is justified. *Bronster, supra,* 363 F.3d at 849.

 Measured against these tough standards, Defendant's motion fails. First, the Court does not consider the circumstances pertaining to the recently-produced documents to be extraordinary. The Executive Life insolvency necessarily involved millions of documents, and the evidence shows that the Commissioner took appropriate steps to collect and arrange the documents, to produce what had been called for in this action, and to allow Defendant access to the documents. It would not be surprising or extraordinary if, among the millions of documents involved in the Executive Life situation, some documents unwittingly had not surfaced earlier. There is no evidence, however, that the documents produced by Plaintiff in the fall of 2011 were documents the Commissioner deliberately withheld before this case was tried in 2005. There is nothing in the record before the Court that would gainsay the good faith of the Commissioner in this regard.

Second, although the matter is not free from all doubt, the preponderance of the evidence makes it likely that most, if not all, of the documents produced in late 2011 were duplicates of documents produced earlier. Christopher Maisel's declarations show that he had an established procedure for managing documents when he was deputy commissioner, and this involved having a master set, together with a working copy. With the closure of his office, the master set was sent to the Commissioner's office; the working set, Mr. Maisel said, either went to Rubinstein & Perry or to the law firm of Cantilo, Maisel & Hubbard, of which he was a partner. The Cantilo, Maisel & Hubbard law firm subsequently disbanded. A new law firm, Cantilo & Bennett was formed, and apparently it took possession of what Executive Life documents had been at the previous firm. Mr. Maisel, however, was not a member of the new firm of Cantilo & Bennett. The master set was among the documents either produced or made available to Defendant. This is an entirely plausible way for a government agency to handle the processing of documents in the context of an insurance company insolvency.

What makes this seemingly straightforward narrative slightly clumsy is that in 2004, prior to the trial here, Mr. Maisel reviewed some of the documents that were resident at the Cantilo & Bennett law firm, in connection with a request for additional assistance from the Commissioner. At that time the Commissioner and NOLHGA were involved in a separate dispute that was not part of this lawsuit, and different lawyers represented the Commissioner from the lawyers of record in this action. Mr. Maisel no longer acted in an official capacity for the Commissioner, although he obviously knew that there were documents in the Austin law firm that pertained to this lawsuit as well. Still, there is no bad faith on the Commissioner's part, and no practical reason why one set of lawyers should have addressed whether documents should have been produced in a different lawsuit.

Even if Mr. Maisel himself somehow could have had an obligation to deliver these documents to Defendants at that time, this fact does not establish a prerequisite fact to termination of this action now. To begin with, Defendant itself was told long ago that there were documents at the Cantilo & Bennett law firm. At the time of his deposition, Mr. Maisel was questioned about documents, and he testified clearly that there were some documents at the Cantilo & Bennett firm. He did not testify then, as he has now, about the same specific procedures that he followed in processing documents while acting as Deputy Commissioner, but his declaration testimony in connection with these proceedings does not *contradict* his deposition testimony; rather the testimony now is more detailed, and perhaps more nuanced, on the precise question of how he managed documents, probably because that issue was not at the fore at the time of his deposition. The Defendants could have pursued documents from Cantilo & Bennett (of which, at that time, Mr. Maisel was not a member), as they did with many other law firms on which they served records subpoenas. Moreover, there still is not a significant showing that the documents were not largely duplicates of

documents that were turned over or made accessible to Defendant during the discovery process.

Defendant also protests that Plaintiff has violated an order issued by Judge Woehrle governing discovery. On October 8, 2003, Judge Woehrle issued a minute order, confirming her oral order at a hearing that day, to the effect that documents had to be produced by the parties "if any such documents are currently in the possession of counsel or the party, wherever located." The order adds little to obligations that would exist in any event, specifically referencing the obligation to supplement discovery responses that is found in Rule 26(e). See Minutes of Proceedings on October 8, 2003, Docket No. 1409.

Analyzing the present motion under the rubric of Rule 60(b), Judge Woehrle's order largely is a red herring on this motion. The parties dispute whether the order covers all counsel who worked on any matter concerning Executive Life, and it does seem unlikely that it was intended to reach so far. But, even assuming that the order would have covered the documents that Mr. Maisel says ended up at Cantilo & Bennett, and even positing, for argument's sake, that the order was violated, that violation does not in and of itself constitute a manifest injustice justifying the termination of the action. For there to have been a manifest injustice, the results of the violation would have to have been demonstrably significant to the outcome. Here, however, the Court has found that the preponderance of evidence favors the conclusion that the vast majority of the 2011 production were duplicates of matters produced earlier. In addition, as will appear further, Defendant simply has not made a showing of a significant adverse impact.

Defendant has identified a couple of documents that it says were not among those produced. Even as to those, it is far from clear that the documents were not made available for inspection. Defendant did have the opportunity to review documents from the Commissioner's warehouse, and Defendant took advantage of that opportunity. The evidence suggests that the new documents may well have been among those available in the warehouse. One can never know with certainty, but certainly the moving party—the party seeking the sanction of dismissal—has not shown that the documents were not made available, and the Court finds that it is more likely than not that they were made available.

Those documents were not, in any event, so critical as to justify termination of the action for their non-production. Artemis identifies a document from the Blackstone Group which was critical of NOLHGA's credit facility for not providing the policyholders sufficient security. As demonstrated by portions of the trial transcript submitted in connection with this motion, the subject of the vitality of NOLHGA's credit facility arose frequently at trial. There is nothing epiphanic about this supposedly-new document. At oral argument, counsel for Artemis essentially stated that, in a dry case like this, one will have dry documents, not smoking guns. Be that as it may, the production of this dry document does not illuminate where once there was darkness, and it does not justify the sanction of terminating the case.

Artemis also addresses a document that apparently was a preliminary outline of Mr. Dummer's testimony. The undersigned has great doubt as to whether the outline would be admissible in evidence. It was drafted by an attorney from Latham & Watkins, not by Mr. Dummer, and Mr. Dummer states under oath that he never saw it. Perhaps it would be admissible as a party admission, as Artemis suggests, but the Court has significant doubt on that score.

In any event, the most that can be said about that document is that it might have impeached Mr. Dummer's testimony because the attorney who prepared the outline thought that the Enhancement Agreement Mr. Dummer was discussing said something different from what Mr. Dummer testified. The Agreement itself, however, was admitted in evidence, and it does not seem plausible that the attorney's beliefs, uncommunicated to Mr. Dummer, could have so undermined Mr. Dummer's testimony (that was in fact backed by the Agreement itself) as to have cast his testimony in a substantially different light. Again, this is not such an important

document that, even if it had been withheld, its withholding would justify the sanction Artemis seeks.

Considered under the rubric of Rule 60(b), therefore, and taking into account the constraints imposed by the law of the case doctrine and the mandate rule, the Court concludes that the September and November 2011 production of documents does not justify the sanction of ending this case. Nor can that sanction be grounded on the basis of the Court's exercising its inherent powers. There has been, for example, no fraud on the Court or other serious offense directed at the Court to justify the Court's need to protect its own processes. *See United States v. Estate of Stonehill,* 660 F.3d 415, 443–45 (9th Cir.2011). A Court should be especially careful in looking to its inherent powers as a source to justify dismissal of an action in any event. *Wyle v. R.J. Reynolds Industries, Inc.,* 709 F.2d 585, 589 (9th Cir.1983).

As noted at the outset, however, the parties analyze this motion differently, pointing to the provisions of Rule 37. For the sake of completeness, the Court now also assesses the facts under the Rule 37 rubric.

■ As indicated, the cases identify five factors to consider:

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.

*Malone v. U.S. Postal Service, supra.* As far as the first factor is concerned, it is kind of silly to speak of the expeditious resolution of litigation in a case that is thirteen years old and concerns a sale of assets occurring approximately twenty years ago. As for the second factor, the Court does need always to manage its docket, but this factor does not have any greater importance now than it ever did; the production of the documents has no impact on this factor. As for the fourth factor, public policy always favors disposition on the merits and, if anything, that factor favors Plaintiff even more at this stage of the case because of the Court of Appeals'

mandate that the remaining issues be retried. As for the fifth factor, less drastic sanctions is not much of a factor; after all, the Court of Appeals has said that there will be a retrial, and the issues can be fleshed out in any retrial. It is hard to see how any additional discovery would be of any benefit, but such discovery also could be available, at least in theory.

The only factor of any real significance, when analyzed under a Rule 37 construct, is the third factor, the factor of prejudice. But, as indicated above, Defendant has not shown that it has been prejudiced. Yes, it lost at trial on the question of the existence of harm, but there is nothing to suggest that any documents recently produced would have changed that determination. To the matters discussed above, Defendant adds that it *might* have prevailed on the NOLHGA Premise the first time around, but that surely is speculative, given the nature of the documents that have been identified. And Defendant will have another opportunity at the retrial. Defendant protests that memories fade and evidence is lost as time goes by, both unassailable propositions in the abstract, but Defendant points to no particular witness no longer available or to a person's memory that has faded and cannot be refreshed. Surely, too, the Court of Appeals also was aware of these human characteristics when it nevertheless ordered a retrial.

One assesses the factors under Rule 37, of course, only if there first has been a discovery violation that implicates Rule 37. Here, however, the legal prerequisites for application of Rule 37 do not appear so readily. Rule 37(b) empowers the Court to dismiss an action for failure to comply with a court order to provide discovery. The power is discretionary, not mandatory. Defendant references Judge Woehrle's order discussed above, but there is some ambiguity in the order. Certainly there is reason to have understood the order in the way Plaintiff and NOLHGA assert here—that it applied to attorneys in this case, and to documents actually in their possession. While one can argue for a broader interpretation as Defendant has done, the fact that the order is subject to different interpretations counsels against dis-

missing the action for supposed violation of the order.

Rule 37(c), by referencing the remedies available under Rule 37(b), also allows a court to dismiss an action for failure to supplement a discovery response as required by Rule 26(e). This is somewhat circular in this case; if the documents were duplicates, then there was no obligation to supplement. Rule 26(e) imposes an obligation to supplement if a party learns that "in some material respect the ... response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process." On the state of the record before this Court, the Court cannot say that the obligation under Rule 26(e) arose, and therefore certainly cannot say that terminating sanctions are justified under Rule 37(c).

Finally, Rule 37(d) also empowers the Court to terminate an action for a discovery violation, but that portion of the rule does not apply here. That rule provides, *inter alia,* for sanctions against a party who has not served its objections or written response to a request for production of documents. As a prerequisite to such sanctions, the moving party must certify that it has attempted to confer with the opposing party to obtain a response without court action. Thus, the sanction cannot be imposed if a response has been given. Here, of course, responses were given and documents were provided. Hence, there could be no basis under Rule 37(d) for the imposition of sanctions.

As indicated in the forgoing, the undersigned can see no justification for ending this litigation after it has gone on so long and through so many phases. Accordingly, Defendant's motion for sanctions is denied.

IT IS SO ORDERED.